UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

IN RE:

DAVID CRANSTON CLAY, II and Case No. 10-69362-wsd
KAREN DORTHY CLAY, Chapter 13
 Hon. Walter Shapero

    Debtors.
_____/

DAVID CRANSTON CLAY and
KAREN DORTHY CLAY,

    Plaintiffs,

v. Adv. Pro. No. 10-7245

CSB BANK,

    Defendant.

_____/

## OPINION REGARDING VALUE OF REAL PROPERTY

This matter is before the Court upon Debtors' Complaint requesting a determination of the extent of the lien of Defendant CSB Bank ("CSB"). The parties stipulated to submitting the matter to the Court in lieu of a trial (Docket No. 39) and the Court entered an order directing the parties to file trial briefs (Docket No. 40). The Court then took the matter under advisement.

I.

Debtors filed their joint voluntary chapter 13 petition on September 22, 2010. As part of their proposed chapter 13 plan, Debtors will retain their residence located at 21401 Armada Ridge Road, Armada, Michigan (the "Residence"). Per the stipulated

1

10-07245-wsd    Doc 51    Filed 11/28/11    Entered 11/28/11 11:07:35    Page 1 of 5

facts (Docket No. 40), Debtors' Residence is encumbered by a first mortgage in the amount of $244,853.70[1] and CSB holds a second mortgage in the amount of $115,129.19.

Debtors contend that the CSB's mortgage is completely unsecured. Debtors initiated this adversary proceeding seeking to treat the second mortgage as an unsecured debt under the plan, i.e., to "strip it" from the Residence.

The parties' stipulated exhibits include fours appraisals, two commissioned by Debtors and two by CSB. The Court extensively reviewed the appraisals relied on by each party as well as the deposition transcripts of Mr. Michael Brian, Debtors' primary appraiser, and Mr. Daniel Weaver, CSB's appraiser. Mr. Brian's appraisal valued the Residence at $240,000 as of December 9, 2010, which is just slightly lower that the amount owed on the first mortgage. In contrast, Mr. Weaver's appraisal valued the Residence as of September 22, 2010 (the petition date) at $322,000.

## II.

The primary issue to be decided is whether CSB's mortgage is wholly unsecured. If it is wholly unsecured, then it is not subject to the anti-modification protection of § 1322(b)(2). *Lane v. W. Interstate Bancorp (In re Lane)*, 280 F.3d 663, 665 (6th Cir. 2002). To decide this particular issue, the Court does not need to determine the actual value of the Residence; rather, it need only determine whether the value of the Residence, as of September 22, 2010, was greater than $244,853.70, the amount of the first mortgage.

Pursuant to the Supreme Court's decision in *Assocs. Commer. Corp. v. Rash*, the appropriate valuation is the "replacement value," that is, "the cost the debtor would incur to obtain a like asset for the same 'proposed…use.'" 520 U.S. 953, 965 (1997). In this case, that would be a consumer purchasing a home as a personal residence, so "retail" or "fair market value," keeping in mind that *Rash* involved a vehicle, the value of which likely did not vary with its location, unlike real estate. The parties agree that the Debtors bear the burden of proving the value of the Residence is less than the first mortgage and that the appropriate date for the valuation is the chapter 13 petition date, September 22, 2010.

---

[1] CSB's trial brief claims the mortgage balance was only $243,188.59 as of petition date. Nonetheless, the CSB stipulated to the $244,853.70 number.

## III.

A review of the evidence leads the Court to conclude that Plaintiffs' have not met their burden of proving the Residence was worth less than $244,853.70. While the Court found both appraisers to be of relatively equal credibility based on a review of their depositions, it is not convinced that Mr. Brian's appraisal adequately represents the value of the Residence.

First, Mr. Brian used two comparable homes sales that vary significantly from the Residence. Mr. Brian testified that, for purposes of comparable homes, he preferred to stay within one mile of the Residence and use homes with a square footage between 2,500 and 2,900 square feet. However, the third comparable he used has 1000 less square footage than the Residence. The Court concludes that this discrepancy lessens the weight that home should be given in the appraisal. In addition, in order to compensate for this substantial square footage differential Mr. Brian needed to make adjustments that exceeded appraisal industry guidelines for single and total adjustments.

Similarly, Mr. Brian testified the second comparable he used was sold as a foreclosure. The use of foreclosed homes is entirely appropriate in light of the overall impact of the economic decline in Southeastern Michigan in the last three years. As this Court previously stated, "A proper valuation should take into account all of the indicated types of sales (distressed and non-distressed) and other factors[.]" *Siler v. Citibank, N.A. (In re Siler)*, Adv. Pro. 09-6926, Docket No. 21, p. 4 (Bankr. E.D. Mich. Nov. 17, 2010). Mr. Brian did not, however, make any adjustments to the second comparable's value to account for the distressed nature of the sale. *Id*. (appraiser failed to make an upward adjustment to distress sale comparables "to take their condition into account"). Mr. Brian's appraisal fails to account for the distressed nature of comparable two and the lack of an upward adjustment reduces the value of the home, which in turns lowers his overall estimation of the value of the Residence.

The final and most important reason the Court gives less weight to Mr. Brian's appraisal is the unexplained reduction of $8,500 from the average adjusted value of the comparable homes. The average of the adjusted values of the three comparable homes (and leaving aside the above lack of an upward adjustment to comparable two) is approximately $248,594. Mr. Brian's appraisal valued the Residence at $240,000. At his

3
10-07245-wsd    Doc 51    Filed 11/28/11    Entered 11/28/11 11:07:35    Page 3 of 5

deposition, Mr. Brian agreed that typically the average of the adjusted sales price of the comparable homes is the appraised value (Michael Brian Deposition Transcript, Docket No. 47, p. 67). In this case, however, Mr. Brian testified that there was no one particular factor or condition that he could identify to support the $8,500 reduction to the already adjusted sales price average. From what observed he just thought the $240,000 value represented a "better value" (Id.).

The Court concludes that such an adjustment, given its effect on the result, requires a more concrete and objective explanation. It is clear from the Court's review of Mr. Brian's deposition testimony that Mr. Brian expressed significant concern regarding the Residence's proximity to a purported landfill and the location of the well. Even giving Mr. Brian the benefit of the doubt, his appraisal already included an across the board adjustment of $3,000 for the Residence's proximity to purportedly closed landfill and the issues he identified with the well. Those conditions, to the extent they in fact impact market value, were already accounted for and cannot support a further downward adjustment of $8,500. Overall, Mr. Brian could not point to any objectively quantifiable factors justifying his additional reduction of $8,500 from the adjusted sales price value. Therefore, the Debtors failed to meet their burden of proving that the value of the Residence is below the amount of the first mortgage.

That the Court does not conclude that Mr. Brian's appraisal is an accurate valuation of the Residence does not mean that it finds Mr. Weaver's appraisal completely reliable either. For example, Mr. Weaver testified that he cannot, "with a good conscience" (Daniel Weaver Deposition Transcript, Docket No. 48, p. 30), use real estate owned or foreclosure comparables in an appraisal because of the amount of expenses a buyer may incur to repair unknown problems or conditions. However, in addition to the Court already expressed views on the proper use of foreclosed or real estate owned homes expressed above, Mr. Weaver's appraisal clearly states that "[i]n order to find a similar property that sold on the market it was necessary to use an REO sale." (CSB's Trial Brief, Exhibit 2, Daniel Weaver's September 22, 2010 Appraisal, p. 5). While not identified, Mr. Weaver apparently did in fact use a distressed sale comparable in compiling his appraisal. Further, similar to Mr. Weaver's opinion that Mr. Brian should not have used a comparable with substantially less square footage comparable, Mr.

Weaver used a comparable that sat on substantially less acreage than the Residence. While the adjustment he made was within industry guidelines for a single adjustment, the Court concludes that a buyer looking for a home similar to the Residence likely would not consider a home that sat on nearly 5 acres less land. Therefore, the Court concludes that Mr. Weaver's appraised value also not completely indicative of the Residence's value.

The foregoing said, the Court reiterates that it need not, for purposes of this opinion, determine the exact value of the Residence. Rather, the Court need only determine if the value of the Residence is more than the first mortgage. The Court concludes that the Residence's value is greater than the total amount owed on the first mortgage. Therefore, the Court holds that that judgment should be GRANTED in favor of CSB.

### IV.

Defendant shall submit an appropriate order.
.

**Signed on November 28, 2011**

                                          **/s/ Walter Shapero**
                                    **Walter Shapero**
                                    **United States Bankruptcy Judge**